No. 2,464.

ADAM T. FARISH *et al*, RESPONDENTS, *v.* HENRY P. COON *et al*, APPELLANTS.

SCHOOL LAND WARRANTS—LOCATION OF.—Under the Act of May 3d, 1852, "to provide for the disposal of the five hundred thousand acres of land granted to this State by Act of Congress," school land warrants can only be located on lands belonging to the United States subject to such location.

IDEM.—TIDE LANDS.—Lands covered by the ebb and flow of the tide are not subject to location with school land warrants; nor does the location of such lands with school land warrants confer on the locator a right to the possession as against the true owner, or amount to a color of title.

IDEM.—Where school land warrants are located on lands belonging to the State not subject to such location, the State is not estopped from asserting title to such lands by the fact that the purchase money for the warrants was paid into the State Treasury, and has never been refunded, or offered to be refunded.

IDEM.—The purchaser of school land warrants was bound in law to know that they could only be located on lands belonging to the United States.

IDEM.—Where such warrants were, through mistake, located on other lands not subject to location, the only remedy was to float the warrants and locate on other lands.

IDEM.—Neither the United States Register for California, nor the Surveyor-General of the State, have authority to approve the location of school land warrants on tide lands belonging to the State.

ESTOPPEL.—Equitable estoppels are founded solely on the theory, that to permit the party to maintain the right which he asserts would operate as a legal fraud upon his adversary.

PLEADING, CONSTRUCTION OF.—In construing a pleading, it is not permissible to take an isolated sentence, separated from its context, and give effect to it as an independent averment, unless upon the whole pleading it appears to have been so intended.

CAL. REP. XL.—3.

TIDE LANDS,—SALE OF.—INJUNCTION.—PLEADING.—In an action to restrain the sale or other disposition of tide lands by the State, it is not enough to allege that she has no title, but it should be shown in what manner her title was lost, or for what reason she should be enjoined from selling and disposing of the land which, *prima facie*, is subject to her control.

IDEM.—STATUTE OF LIMITATIONS.—A party in possession of tide lands belonging to the State, who afterward locates school land warrants on such lands, and thenceforth claims and occupies under such locations, holds not adversely but in subordination to the title of the State, and the Statute of Limitations will not run against the State.

IDEM.—The locator of the warrants is in the position of a purchaser in possession, whose possession is not hostile but in consonance with the title of the vendor; and in order to put the Statute of Limitations in motion, it must appear that the locator repudiated the title of the State, and claimed to hold, not under that title, but in hostility to it.

ADVERSE POSSESSION.—POSSESSION UNDER VENDOR NOT ADVERSE TO VENDOR'S TITLE.—Where the purchaser of a tract of land, through mistake or fraud, enters upon another tract of the same vendor, the entry is under a claim of title assumed to have been derived from the vendor and is in subordination to the vendor's title.

IDEM.—The essence of an adverse possession is, that the holder of it claims the right to his possession, not under, but in opposition to, the title to which his possession is alleged to be adverse.

TIDE LANDS.— STATUTE OF LIMITATIONS.— That the tide lands held by the State in virtue of its sovereignty, are not within the purview of the third section of the Statute of Limitations, not decided.

APPEAL from the District Court of the Tenth District, Yuba County.

The facts are stated in the opinion.

*Jo Hamilton,* Attorney-General, for Appellants; *Hambleton & Gordon,* of Counsel.

*First*—The Court will take judicial notice that the salt-marsh and tide lands affected by this suit are a part of the Bay and Harbor of San Francisco. (*Brumagim* v. *Bradshaw,* 39 Cal. 24.)

*Second*—The pretended locations made by the predecessors of plaintiffs, and entry under them, with regard to the premises in dispute and their hostile claim under them are insufficiently stated as an affirmative plea of the Statute of Limitations, but indicate a holding and possession in sub-

ordination to the leading title of the State rather than an adverse possession.

*Third*—The complaint by open avowal, and by implication, plants itself upon the theory that, by these locations a *constructive* possession of the disputed lands was acquired.

But under the Statute of Limitations they cannot be deemed to have been held adversely.

1st. Because there was no *bona fide* claim of title founded upon a written instrument, as being a conveyance of the premises in question. These salt marsh and tide lands were, to the knowledge of the parties making the claim, lands held by the State of California in trust for general purposes of commerce, navigation and fishery, and as lands covered with water, to be used as public highways, and not for the purposes of cultivation or improvement. ( *Wolfskill* v. *Malajowitz*, 39 Cal. 276; *Cannon* v. *Union Lumber Co.* 38 Id. 672.)

2d. Because their entry under claim of title not founded on a written instrument—that is, their entry, and holding by bow and spear, obviously refers alone to the uplands, and to premises not in dispute in this action.

3d.—Because there is no pretence that these tide lands were protected by a substantial inclosure, or had been usually cultivated or improved. (*Polack* v. *McGrath*, 32 Cal. 19–21; *San Francisco* v. *Fulde*, 37 Id. 349; *Borel* v. *Rollins*, 30 Id. 408; *McFarlane* v. *Kerr*, 10 Bosworth, 255; *Corning*, v. *Troy Iron Factory*, 34 Barb. 529.)

4th.—Because the complaint shows that as to a portion of these tide lands, plaintiff's predecessors in interest, Farrington and Ludlum, exercised the common right of fishery thereon, in planting oyster-beds, etc., and this was the exercise of a right not adverse but in subordination to the title of the State. (*McCracken* v. *San Francisco*, 16 Cal. 636.

5th.—Because the locations made under the Possessory Act, and under the Act of May 3d, 1852, with reference to school lands were absolute nullities, and did not constitute color of title, or the basis of an adverse possession. (*Ber-*

*nal* v. *Glein*, 33 Cal. 676; *Livingston* v. *Peru Iron Co.* 9 Wend. 511; *Harvey* v. *Tyler*, 2 Wallace, 349.)

The provisions of the Possessory Act of April 20th, 1852, required an actual settlement upon the public domain, for the purpose of cultivation or grazing. (*Coryell* v. *Cain*, 16 Cal. 573; *Gird* v. *Ray*, 17 Id. 352.) The alleged location of the school land warrants under the Act of May 3d, 1852, was null because the lands had not been surveyed. (*Terry* v. *Megerle*, 24 Cal. 609; *Megerle* v. *Ashe*, 27 Id. 328; *Grogan* v. *Knight*, Id. 520; *Smith* v. *Athearn*, 34 Id. 512.)

Tide lands and lands covered with water belong to the State by virtue of her sovereignty, subject only to the rights of commerce and navigation, and are not acquired derivitively by grant from the United States. (*People* v. *Davidson*, 30 Cal. 393; *Mumford* v. *Wardwell*, 6 Wall. 436.)

6th. Because there can be no constructive possession of a public common. There would be no claim in good faith—no exclusive possession; and besides, the lands could not be said to be *unoccupied* when these parties entered upon their pretended locations; but, on the contrary, the State must be presumed to have been in the exercise of her sovereignty by a constant user, and there is nothing in the complaint to negative the fact of its subsequent continuance during all the times of the pretended adverse holding. The facts alleged only show an encroachment, or, at best, a nuisance, and no lapse of time will ripen a public nuisance into a right. (*Kittering Academy* v. *Brown*, 41 Penn. St. 273.)

7th. Because the complaint shows that the plaintiffs have not been in possession, *claiming* title—leaving out all questions of good faith. They only claim that they took certain steps to *acquire* a title, which, by that very act, they admit they have not. All they claim is, that they went upon the land knowing that it did not belong to them, but to the State of California, and took certain steps by which they believed they could acquire a title. If this amounts to an equity, it certainly is not title under the Statute of Limitations.

*Fourth*—The Statute of Limitations against the State does

not apply to tide lands. This proposition follows necessarily, from the nature of the tenure by which the State holds these lands.

1st. They are not *acquired* by the State, and the rights of the State with respect to them did not accrue at all in the sense of the statute. Nor does the State own these lands, as a *proprietor*, which implies the right of exclusive appropriation and the use of them for the purpose of deriving rent and profit from them.

2d. They are not such real property as is referred to in the statute, which has reference alone to land in its ordinary sense, and not land covered with water. It must be held to apply only to such lands as the State owns, in the ordinary sense of ownership, and to which its rights might accrue casually during its existence, and from which it could derive rents and profits as an owner, and not merely income by a tax imposed for police or governmental purposes.

3d. The State of California, at its birth, to wit: on the ninth day of September, 1850, became invested with the right and title to these tide lands, and its right and title then accrued; and if Section 3 of the Statute of Limitations was designed to include them, no action could have been instituted with reference to them after the ninth of September, 1860.

*Fifth*—But if Section 3 of the Statute of Limitations did apply to tide lands of the State, still Sections 10 and 11 of the Act do not apply to or affect the State. Unless expressly provided, the rule would be that the State was not included. The statute itself shows that those sections have reference only to private property, and not to public property held in trust. In the section applying to the State there is nothing said about seizin in the State or its predecessor within ten years, nor is there any provision as to rights to accrue, as against the State, by adverse possession. There can be no adverse possession as against the State, and the State, with reference to its *jura communia*, cannot be disseized. (2 Washburn on Real Property, 28 Mississippi 6 Cush. 753.)

*Sixth*—If the Legislature designed to include these tide lands by and under the provisions of Section 3 of the Statute, then it is unconstitutional and void. The State holds these lands in trust, not only for her own citizens, but for the citizens of the United States generally. Her own powers with regard to their alienation are extremely limited. When such lands are disposed of by the State it is through the Legislature, which acts also as the representative of the public; and such alienations are void if they obstruct navigation, and are only tolerated because they establish a better water front, presumed to be more commodious for the purposes of commerce. (*Ward* v. *Mulford*, 32 Cal. 372; *People* v. *Davidson*, 30 Id. 393; *Commonwealth* v. *Brent*, 4 Pick. 461; 18 B. Monroe, 262.)

The power of the State with regard to these lands is subject to that of the General Government, and cannot be exercised in a manner repugnant to the Constitution of the United States. (Angell on Tide waters, 59; *Gibbons* v. *Ogden*, 9 Wheaton.)

*Seventh*—The State of California was admitted upon the express condition, among other things, " that all the navigable waters within the said State shall be common highways and forever free," etc., (I Hittell, par. 242.) If therefore Section 3 of the Statute of Limitations could otherwise be construed as subjecting tide lands to its provisions, the Legislature has attempted to do, indirectly, that which was not in its power to effect by direct grant, and any such surrender and relinquishment of its prerogatives in favor of trespassers and intruders is utterly null and void

*Nathaniel Bennett,* for Respondents; *Whiting & Naphtaly* and *Haymond & Stratton,* of Counsel.

*First*—The officers named in the Act of March 30, 1868, are not authorized to interfere with any lands unless they *belonged to the State* at a given time, and the lands affected by the complaint did not belong to the State at that time. It is manifest, therefore, that all acts of these officers af-

fecting such lands are wholly unauthorized by law, and illegal.

1st. The rights of plaintiffs are governed by the Act of May 3d, 1852, under which the locations were made, and which was in force during the respective periods when the locations were made. Suppose the locators were mistaken in their supposition that the lands were subject to location, the Act informs us what the result would be; but it is nothing which can affect the plaintiffs' rights under this complaint. A reference to the Act will sustain our position. Section 5 reads thus: ''The location made of the lands belonging to the United States as aforesaid, shall secure to the purchaser the right of possession to the land embraced within the said survey," etc.

Section 6 particularly recognizes the rights of an actual settler in the first proviso.

The location of warrants by Farrington and Ludlum, and their associates, was made upon lands on which they had actually settled and made expensive improvements, and the location of that tract of six hundred and forty acres falls within the precise terms of the proviso quoted.

A second proviso in the same section further recognizes the rights of location of the actual settler. Farrington and Ludlum were the first settlers within the meaning of this last proviso, and had made improvements on the tract on which they proposed to locate, and on which they or their associates did locate the school warrants.

The next section provides for the contingency of the locator's mistake in supposing the lands located upon subject to location. This section thus supposes that owners of warrants might make a location upon lands not subject to location. In such case they could float their warrants over other land. But it must first be ascertained that the lands first located upon were not subject to be taken. No such point has been legally ascertained or determined in respect to either of the parcels of land mentioned in the complaint. Both the State and the United States have treated both the locations as properly made. These lands have been allowed

to the United States by the State as so much of the five hundred thousand acre grant—they have been charged to the State—the State has received the money for such locations, and still keeps it. The law, in such case, secures to the purchaser the right of possession, as we have seen from Section 5 of the Act—and such purchasers and their grantees are still entitled to such possession, and will continue to be entitled to such possession, until it shall have been legally ascertained and determined that they must float their warrants on to some other land.

It does not lie in the mouth of one of the two parties to a location of school warrants, to determine finally that such location was invalid. The location having been once made and the lands located upon, having been once set aside for the purposes of such location, and segregated from the public lands and credited to the United States, and charged to the State, and conceded to the purchaser, it is not for the purchaser to say that his location was illegal, and that therefore he will float his warrants on some other tract. No more is it for the State alone to hold such language. The State, no more than the purchaser, can decide for itself that the land located upon was not subject to such location. Both parties must be heard in the matter; and if they disagree upon the subject, the judiciary alone can determine their differences. The plaintiffs claim that the locations named in the complaint were made on public lands of the United States, and are valid and binding. If the State asserts the contrary, she can maintain her position only by recourse to the judiciary, and she must have the point judicially determined before she is in a position to question our right of possession.

If, then, the plaintiffs have the right of possession expressly given them by Section 5 of the School Land Act, they are in a condition to sustain an injunction against any one about to interfere with their rights of possession.

But even if the locations were invalid and illegal, the plaintiffs have rights which cannot be encroached upon by a party that has no rights whatever in the land, in which

predicament we have shown the State to be.    The case of
*Butterfield* v. *Central Pacific R. R. Co.* (31 Cal. 264), shows
that the plaintiffs could maintain trespass against any person
entering on these lands by authority of the State—against
these very defendants in case they had actually committed
a trespass on these lands.

The parties locating the warrants must be deemed to have
acquired an interest in the land located, and if for any valid
cause such location has been annulled, or, might be added,
could be annulled, the burthen is on the defendants to show
it.    (*Richter* v. *Riley*, 22 Cal. 639.)

It may be well to notice here that the public lands of this
State were subject to location by the holders of school
warrants, issued under the Act of May 3d, 1852, previous
to their survey by the General Government.    (*Van Valken-
burg* v. *M'Cloud*, 21 Cal. 330.)

2d.   The plaintiffs are, and have been since 1852 and 1853,
in the possession of the lands in controversy.

A possession taken under documents framed pursuant to
the Possessory Act, and under such Act, and under school
warrants, and the Act authorizing their issue, and under the
deed of trust, we claim to be attended with the same legal
consequences, so far as concerns the possession of an entire
tract, as a possession taken under a deed or other instru-
ment in writing.

3d.   The threatened acts of the defendants are of such
character, that the injunction ought to be retained as a pre-
ventive remedy.

The facts make out good cause for an injunction by the
law of the land, thus: threatened *sale of land* is good ground.
(Hilliard on injunc. page 8, § 13).   The *amount* of the actual
injury where a right is involved, is held not to be material.
(Id. page 10, § 14).   By the threatened proceedings of the
defendants a cloud will be thrown over the title as much as
in *England* v. *Lewis*, 25 Cal. 338.   (See authorities cited at
close of opinion on page 357; see also *Smith* v. *Morse*, 2 Cal.
524; *Guy* v. *Hermance*, 5 Id. 73; *Pixley* v. *Huggins*, 15 Id.
128; Hilliard on Injunc. p. 23, § 42, and the case of *Abty*

*&c.* v. *Sheffield,* 19 Eng. L. and Eq. 639, there cited; *Curran* v. *Shattuck,* 24 Cal. 427; *Campbell* v. *Scott,* 11 Simon, 39; *Rochdale* v. *King,* 2 Id. 78; *Mohawk R. R. Co.* v. ——— 6 Paige, 83–8; *Hartwell* v. *Armstrong,* 19 Barb. 166.)

*Second.*—The threatened act of the defendants, if permitted to be carried out, will operate as a location of the railroad parcels on land which was, at the date of the passage of the Act of March 30, 1868, in the *bona fide* possession and occupation of citizens of this State; and a location on lands in such a predicament is prohibited by the positive language of the Act. (Stats. 1867–8 p. 719.)

*Third*—Conceding that the State was at one time the owner of the lands in question, yet its ownership closed long before the passage of the Act of March 30, 1868. The State has lost, and the plaintiffs have acquired the State's title, by force of the Statute of Limitations. (2 Hitt. Dig. Art. 4345.)

If the State and the people are barred from recovering the property by the peaceable instrumentality of a suit, they must certainly be barred from taking it by force, or from trespassing upon it. And what the State itself cannot do, it cannot empower the Tide Land Commissioners, or the special officers designated, or the "State Board," to do.

Assuming that the possession was originally of such a character as to set the Statute of Limitations in motion, and that it was continuous during ten years, then we have gained a perfect title as against the State, and those claiming under the State, by force of the doctrine announced in the case of *Arrington* v. *Liscom,* 34 Cal. 365. (See *Harrison* v. *Pool,* 16 Ala. 174; 3 Washb. 245.) Our title is sufficient to defend against ejectment brought by the State. But inasmuch as our title is not a paper title, but rests in *pais,* we may restrain the State from asserting its pretended title, and from throwing a cloud over our real title, but which, nevertheless, cannot be proved by written deeds of conveyance, and must be established by facts resting in *pais,* and outside of written instruments. Our defence in ejectment would rest in

extrinsic evidence, liable to loss and most available in equity.

The principle of equity jurisdiction to which we call attention, is laid down in *Scott* v. *Onderdonk*, (14 N. Y. 4 Kern. 9); and *Hatch* v. *City of Buffalo*, (38 N. Y. 276,) and is recognized and illustrated in the following cases: *Heywood* v. *The City of Buffalo*, (14 Id. 534;) *Ewing* v. *City of St Louis*, (5 Wall. 413); *The Mayor &c. of Brooklyn* v. *Meserole*, (26 Wend. 132); *Vandorn* v. *The Mayor &c. of New York*, (9 Paige 388.)

CROCKETT, J., delivered the opinion of the Court, SPRAGUE, J., and RHODES, C. J., concurring:

The appeal in this case is from an order refusing to dissolve an injunction obtained by the plaintiffs against the defendants, Coon, Washington and Bullock, as Tide Land Commissioners, appointed under the Act of March 30, 1868, and the defendants, Haight, McCoppin and Otis, composing the State Board, organized under said Act, enjoining the said defendants, and the Southern Pacific Railroad Company, and the Western Pacific Railroad Company, which are also made defendants, from selling or advertising to sell at auction or otherwise, and from assigning, transferring or conveying to said railroad companies, or any other corporation or person, and from permitting or allowing said companies, or any other corporation or person, to take possession of certain tide and salt marsh lands, situate in the city and county of San Francisco, below high water mark in the bay of San Francisco.

The injunction also prohibits the defendants from doing any act or taking any steps to aid or assist said companies, or any other corporation or person, to procure, or meddle, or interfere with, or acquire the title to, or possession of, or any interest in, said lands in hostility to the title or possession of the plaintiffs, or in derogation of their rights. The motion to dissolve the injunction was

made upon the complaint alone, and the motion having been denied, the defendants have appealed. For the purposes of the motion and of this appeal, the allegations of the complaint must, therefore, be taken as true. The claim of the plaintiffs to the relief demanded is founded on the ground that, in 1851, one Weir had a brickyard on the adjoining upland, and erected buildings and employed a large number of men and horses for carrying on the business; that he claimed 160 acres adjoining the brick-yard, on which he pastured his horses; that Farrington & Ludlum succeeded to all Weir's rights for a valuable consideration, and continued to use the premises in the same manner; that, to render their claim more definite and valid, they caused the 160 acres to be surveyed; and, in the name of Farrington, in June, 1852, took up the same under and in accordance with the provisions of the Act of April 20, 1852, entitled: "An Act prescribing the mode of defending and maintaining possessory actions on public lands in this State;" that in the latter part of 1852 they erected a substantial house on said land, at an expense of $1,500; and caused a substantial fence to be constructed around the tract, at a further expense of $1,500; that they immediately entered into the actual occupation of said dwelling-house and the lands so inclosed, and continued thereafter so to occupy them by themselves or tenants; that in January, 1853, Ludlum took up an adjoining tract of 74¾ acres, under the Act aforesaid, for their joint use, and which was thereafter jointly used and possessed by them; that said locations were made in good faith, under the belief that said lands were public lands of the United States or of this State, and that it has since been ascertained and determined by the action of Congress and the adjudications of the Courts of the United States, that at the dates of said locations the said lands were public lands of the United States or of this State; that in July, 1853, Farrington & Ludlum united with Eddy, Story & Reed, who claimed some of the adjoining lands, in an agreement to unite their interests, whereby it was stipulated to form a joint stock company, of which

Reed, Eddy & Ludlum were appointed Trustees, and to cover the lands claimed by the several parties with school land warrants, issued by this State under the Act to provide for the disposal of the 500,000 acres of land granted to the State of California by an Act of Congress, and to hold, improve and sell the said lands, so to be covered by said warrants, for the benefit of the parties composing said company, according to their respective interests; that the warrants were accordingly purchased and duly located in July, 1853, on a tract of 640 acres, which included the Farrington & Ludlum tracts; that the purchase money for the warrants was paid into the State treasury, and has never been refunded or offered to be refunded; that the warrants were located in good faith, and in the belief that the lands were subject to such location, and the parties were so advised at the time by eminent counsel; that in pursuance of said location the said lands were by the Surveyor-General of this State and by the Register of the United States Land Office for this State duly set aside, reserved and segregated from the mass of the public lands of the United States, in satisfaction of so much of the 500,000 acres granted to this State by Act of Congress; that said segregation remains in force and has not been vacated or annulled; that after the location of said warrants all the lands covered thereby were occupied by said Farrington & Ludlum and their said associates to the exterior boundaries thereof; that in 1854, Farrington & Ludlum erected, at an expense of $2,000, a substantial board fence, sufficient to turn cattle, around the two tracts so located by them under the Possessory Act before referred to, and planted oyster beds on the land covered with water, built oyster houses and kept and maintained the same for many years; that Farrington & Ludlum, and those holding with and under them, prior to their conveyance to the plaintiffs, expended in and about the premises and the purchase money thereof the sum of $15,000, and that prior to the first day of January, 1868, there has been expended in buildings and other improvements on the premises the further sum of $30,000; that in 1853 or 1854 one Hiram Pearson, being

the owner of several school land warrants issued under the
Act of 1852, located them in due form upon lands contiguous to those included in the locations already mentioned;
that the lands covered with Pearson's warrants were duly
set aside and segregated from the mass of public lands, and
that Pearson entered upon and took possession of said lands,
and erected several houses and other improvements thereon
to the value of several thousand dollars; that he continued in
possession until he conveyed to the plaintiffs; that they have
ever since been and now are in the possession, as purchasers in good faith and for a valuable consideration; that
the plaintiffs and their predecessors and grantors have expended on said tract, in piling the same, erecting houses
and other improvements thereon, and in defending their title
thereto, the sum of $30,000, in good faith and under the
belief that the rights so acquired would be recognized by,
and would be valid against, both the State of California and
the United States; that such expenditures were made before
any scheme was agitated for the disposition of such lands
by the State; that portions of the lands covered by the said
school land warrants are upland, and other parts are salt
marsh or overflowed lands; that the plaintiffs have succeeded to all the rights of Farrington & Ludlum, Reed, Eddy,
Story and Pearson in and to the whole of said lands, and
that they and their said predecessors and grantors have
been in the *bona fide,* actual, continued, peaceable and
undisturbed possession, holding and claiming the same adversely to the State for the continuous period of more than
ten years, and that no right or title has accrued to the State
during said period; and that during the whole of said
period, neither the State, nor the people thereof, nor those
from whom they claim, has, or have received the rents and
profits of said lands or any part thereof, and that the State
is, therefore, barred by the Statute of Limitations of this
State, as well as in equity and justice, from setting up title
thereto; and the plaintiffs then allege "that no part of said
lands below high water mark, or marsh lands, so claimed

by the plaintiffs, belongs to the State of California, or did belong to said State on the 30th day of March, 1868."

The complaint then avers that the Tide Land Commissioners, under the pretext that those tide and marsh lands belong to the State, have proceeded to have them surveyed and laid out in lots, blocks and streets, and threaten to sell the same, or portions thereof, at auction, and to assign to said railroad companies other portions thereof, under said Act of March 30, 1868, and that said companies threatened to take possession of the lands so awarded to them, in disregard of the rights of the plaintiffs.

It is not pretended on behalf of the plaintiffs that, by virtue of the location under Act of April 20, 1852 (Stats. 1852, p. 158) "prescribing the mode of maintaining and defending possessory actions on public lands in this State," Farrington & Ludlum acquired a title to the land which they could assert against this State or the United States. It is apparent, not less from the title of the Act than from all its provisions, that its only purpose was to prescribe a method not for acquiring title, but to protect the occupant in the temporary possession of a limited portion of the public land. This is too plain to justify discussion or the citation of authorities. Nor is it claimed that the plaintiffs, their predecessors, or grantors, acquired title, *eo nomine*, to the marsh lands covered by the ebb and flow of the tide, by virtue of the location of the school land warrants. The Act of May 3, 1852 ( Stats. 1852, p. 41), under the provisions of which the warrants were issued, defines its purpose in its title: " An Act to provide for the disposal of the five hundred thousand acres of land granted to this State by Act of Congress, that the people of the State of California may avail themselves of the benefit of the eighth section of the Act of Congress, approved April 4, 1841, Chapter XVI., entitled an Act to appropriate the proceeds of the sales of the public lands and to grant pre-emption rights, the following provisions are hereby enacted." The third section of the Act authorizes the warrants to be located " upon any vacant and unappro-

priated lands belonging to the United States, within the
State of California, subject to such location." The tide
and overflowed lands in contest, did not belong to the
United States, and by the very letter of the statute were
not subject to the location of these warrants. But it is
useless to pursue the discussion on this point, inasmuch
as it is not claimed on behalf of the plaintiffs that tide
and overflowed land was subject to location with school
land warrants. But it is insisted that, even though such
lands were not, in law, subject to such location, neverthe-
less, the actual location of the warrants, in good faith, and
an entry in like good faith under the location, qualified and
gave character to the possession; that the locator was not
a mere intruder, without color of right, and is not to be
deemed a naked trespasser. In support of this view we
are referred to sections five and seven of the Act, by the
former of which it is provided, that "the location made
of the lands belonging to the United States, as aforesaid,
shall secure to the purchaser the right of possession to the
land embraced in said survey, until such time as the Gov-
erment survey shall have been made, after which, said
lines shall be made to conform to the lines of sections,
quarter sections and fractional sections of said Government
survey." By the terms of the Act the warrants were
authorized to be located on "any vacant and unappropri-
ated lands belonging to the United States, within the State
of California, subject to such location;" and the Legislature
manifestly contemplated that they might be located on
unsurveyed public lands of the United States; and the
fifth and sixth sections were intended to adjust the lines
of the locator, after the Government survey shall have
been made, and to protect him in his possession until such
survey. But it is plain, that to entitle himself to this
protection, his location must have been made upon lands
"belonging to the United States," as provided in sec-
tions three and five. If he had located his warrant
upon land which had already gone into private own-
ership, and was, therefore, no longer the property of

the United States, no one, I apprehend, would claim that he could invoke Section 5 as a shield against an action of trespass by the true owner.  We cannot impute to the Legislature the absurdity of intending to protect, as against the true owner, a possession acquired in violation of law.  The statute authorized the warrants to be located only upon lands belonging to the United States, and a location upon other lands would be null and void as against the true owner; and an entry under such unauthorized location would be a trespass as against him.  But the Legislature foresaw, that in the then unsettled condition of land titles in this State, it might often be difficult to ascertain what lands were private property and what the property of the United States, and that the holders of school land warrants, acting in perfect good faith, might possibly locate them upon private lands, supposing them to be public.  Deeming that it would work a great hardship in such cases on the holder of the warrant to deprive him of the right to make another location, Section 7 of the Act was intended to supply a remedy by authorizing the holder to float his warrant and locate it on other lands subject to location.  Hence it provides that, "in the event that any location of lands be made under and by the provisions of this Act upon lands supposed to belong to the United States which should prove to be lands not the property of the United States," then, and in that event, the holder may float his warrant and locate it upon any other public land.  But not the least support is found in Sections 5 and 7, or in any other portion of the Act, for the proposition that the location of a school land warrant on lands not belonging to the United States, even though made in perfect good faith, would confer on the locator a right to the possession as against the true owner, or would amount to a color of title.  Such a location as against the true owner would be simply a nullity, and an entry under it a naked trespass.  If A should agree to sell to B a tract of land of which he was the owner, or should authorize him to select out of the general tract a certain number of acres and to enter into the immediate occupation of it, and if B, acting

in good faith, and through an innocent mistake, should enter not upon the lands of his vendor A, but upon the lands of C, no one, I apprehend, would maintain that he entered under color of title, or would not be a mere trespasser. So in this case, the State authorized the predecessors of the plaintiffs to locate their warrants only on lands belonging to the United States, and not upon any other lands whatsoever; and if, acting in good faith and under the advice of counsel, they have made an innocent mistake in attempting to locate the warrants upon lands not subject to location, it is their misfortune to have made the mistake, but the State did not contribute to it, and is in no manner responsible for it. The Act, under which the warrants were issued, defined in the most explicit terms that they could only be located on lands "belonging to the United States," and if, notwithstanding the thoroughly well settled principle, and the numerous adjudications of the Courts to the effect that lands covered by the ebb and flow of the tide do *not* belong to the United States, the plaintiffs and their predecessors have fallen into the innocent mistake of supposing that the warrants could, nevertheless, be lawfully located on these tide lands, it is their misfortune to have been ill advised by the counsel on whom they relied for advice. But the mistake, however innocent, cannot change the character of the transaction, and make that lawful which was wholly unauthorized by law. The location of the warrants on tide lands being void *ab initio*, as against the true owner, their entry under these void locations was a mere trespass, without authority of law or color of title.

Nor is the State estopped from asserting title to these lands by the fact that the purchase money for the warrants was paid into the State treasury, and has never been refunded or offered to be refunded. When the predecessors of the plaintiffs purchased the warrants, they knew, or were bound in law to know, that they could only be located on lands belonging to the United States. The warrants were sold to them by the State for that express purpose and no other, and there was no covenant, express or implied, that if,

through mistake, the warrants should be located on other lands, not subject to location, the State would refund the money. On the contrary it provided a wholly different remedy, to wit: that the warrants might be floated and located on other lands, and this remedy is yet open to the plaintiffs. But to hold that because the plaintiffs' predecessors, in violation of law, located the warrants on tide lands not subject to such location, the State shall be estopped from claiming the land unless she first performs an act which she never agreed to perform, to wit: to refund the purchase money for the warrants, would be to pervert the doctrine of estoppel to purposes of injustice and wrong. Estoppels are maintained on precisely the opposite theory. The State is under no obligation, legal or moral, either to return the purchase money for the warrants or to refrain from claiming the land. She never agreed, either expressly or by implication, to do either the one or the other, and equitable estoppels are founded solely on the theory, that to permit the party to maintain the right which he asserts would operate as a legal fraud upon his adversary. The State is not bound, either legally or in good conscience, to refund the purchase money for the warrants, nor to refrain from claiming these lands, on which the plaintiffs, without her consent and in violation of law, have located the warrants. But the complaint alleges that the lands have been set apart and segregated from the mass of public lands, by the location of the warrants, and have been credited to the United States, as a satisfaction, *pro tanto,* of the claim of the State to the five hundred thousand acres donated to this State by Act of Congress. It is apparrent, however, on the face of the complaint, that this averment is not, and cannot possibly be true in respect to these tide lands. The United States Register for California had no authority in law to consent to the location of the warrants on tide lands not the property of the United States. These lands were not under his control, nor within his jurisdiction for any such purpose; and he had no authority to intermeddle with them. His approval of the locations was *ultra vires,* and therefore a nullity. Nor had the Sur-

veyor-General of this State any authority whatever to approve the location on tide lands. The law had conferred on him no power, in this respect, over tide lands. He had no discretion to exercise in respect to such a location, for the obvious reason that the disposal of such lands in that method was not within his jurisdiction. The Legislature had conferred upon him no power in that behalf; and in attempting to approve of a sale of tide lands under school land warrants, he simply exceeded his powers, and the act was void. It is too plain to merit discussion that if the plaintiffs or their predecessors had obtained a patent from the State for these tide lands, founded on their location of the warrants, and if it had appeared on the face of the patent that the lands were covered by the ebb and flow of the tide, and that the United States Register and the State Surveyor-General had approved the location, the patent would have been void on its face, for the reason that the Legislature had never authorized these lands to be disposed of in that method; and the title of the State could not be divested by the unauthorized acts of her ministerial officers, to whom she had delegated no such authority over these lands. A contrary rule would place all the property of the State at the disposal of her ministerial agents, acting wholly without the authority of law and beyond the scope of their powers.

The complaint, amongst other matters, avers that "no part of said lands below high water mark, or marsh lands, so claimed by the plaintiffs or either of them, belongs to' the State of California, or did belong to said State on the 30th March, 1868," the date of the Act from which the Tide Land Commissioners derive their authority in the premises. The Act authorizes the Commissioners to deal only with tide lands *belonging to the State;* and it is claimed on behalf of the plaintiffs, that, inasmuch as these lands did not, at the passage of the Act, and do not now, belong to the State, and are alleged to be in the actual possession of the plaintiffs, the defendants should be, and were, properly enjoined from intermeddling with them.

But the allegation that the lands do not, and at the date

referred to did not, belong to the State, must be construed in connection with the context and other portions of the complaint. In construing a pleading, it is not permissible to take an isolated sentence, separated from the context, and give effect to it as an independent averment, unless upon the whole pleading it appears to have been so intended. After a careful consideration of the complaint, we are satisfied it was not the intention of the pleader to aver it, as an independent fact, that the lands did not and do not belong to the State. On the contrary, in the preceding portions of the complaint the plaintiffs set out minutely the nature of their alleged title to these tide lands, which, *prima facie,* are *sub modo* the property of the State by virtue of its sovereignty; and after giving a detailed history of the transactions, which, it is claimed, operated in law to divest the title of the State, or at least to establish an equitable estoppel against her, the complaint proceeds to the allege that, by reason of these transactions, " the said State and the people thereof are, by the statutes of said State as well as in equity and justice, barred and precluded from setting up'or alleging or insisting upon any claim or title whatever to said lands as against these plaintiffs;" and immediately succeeding this allegation is the averment, in general terms, that no part of the said tide or marsh lands " belongs to the State of California, or did belong to said State on the 30th of March, 1868." This was evidently intended to be a statement of a conclusion of law, from the facts which immediately preceded it, and was not designed to be an averment of an independent fact. On the other hand, if this sentence be wholly disconnected from its context, and be treated as an independent averment; that on the 30th day of March, 1868, the State had not, and has not now, any title to these lands, it is not sufficient for the plaintiffs simply to allege in general terms that the State had and has no title; but, inasmuch as the State is *prima facie* the owner *sub modo* of the tide lands, and entitled to control them, it is incumbent on those who challenge her right to do so to state in what manner her rights have been

lost or impaired; and why and for what particular reasons she should be enjoined from interfering with the land. It is not enough to allege that she has no title; but it should be shown in what manner her title was lost, or for what reason she should be enjoined from selling and disposing of land which, *prima facie*, is subject to her control.

The complaint in this case is a bill in equity; and in determining its legal effect we must look at the whole complaint, which admits the lands in contest to be tide lands, and which are therefore *prima facie* subject to the control of the Legislature. If it has lost the right and power to control them, the complaint should have stated specifically by what method, if otherwise than is particularly stated.

The only remaining question is that arising under the Statute of Limitations, the third section of which is in the following words: "The people of this State will not sue any person for or in respect to any real property, or the issues or profits thereof, by reason of the right or title of the people to the same, unless: first, such right or title shall have accrued within ten years before any action or other proceeding for the same shall be commenced; or unless, second, the people, or those from whom they claim, shall have received the rents or profits of such real property, or of some part thereof, within the space of ten years."

The complaint alleges that the plaintiffs and their predecessors have been in the *bona fide*, actual, continued, peaceable and undisturbed possession of the land for more than ten years, holding and claiming the same adversely to the State; and that no right or title had accrued to the State during said period; and that during all said period neither the State or the people thereof, or those from whom they claim, had received the rents and profits of said lands, or any part thereof. For the plaintiffs it is insisted that these averments bring the case fully and fairly within the third section of the Act, and that the title of the State is, therefore, barred. It is further claimed, on the authority of Arrington v. Liscom (34 Cal., 365), that the effect of the statutory bar is to divest the title of the State and wholly

extinguish it, as against the plaintiffs; and, consequently, that the defendants were properly enjoined from disturbing the plaintiffs' possession.

As already stated, in construing a bill in equity, we must look at all its allegations, and are not at liberty, to treat an isolated sentence, separated from its context and from other portions of the complaint, as an independent averment, unless it satisfactorily appears to have been so intended by the pleader. In the preceding portions of the complaint there is a detailed narrative of the circumstances under which the plaintiffs and their predecessors entered upon the land. It distinctly appears that the entry was made, first under the Possessory Act; and second, under the location of school land warrants. The complaint so states, and the plaintiffs are bound by this admission. There is an averment, it was true, that as to a portion of the land, one Weir had a brickyard upon it and depastured his horses on the adjoining lands; and that Farrington & Ludlum, who succeeded to his rights, took up this portion under the Possessory Act as a part of the public lands of the United States, and inclosed and occupied the same. But it further appears that Farrington & Ludlum, and others who became associated with them, afterwards located school land warrants on the whole of this tract, and thenceforth claimed and occupied under such location. In respect to such portions of the lands in contest as were originally claimed by Pearson, to whose rights, it is alleged, the plaintiffs have succeeded, it is not pretended that Pearson ever had or claimed any title or possession, except under and by virtue of the location of school land warrants. It appears, therefore, that all the lands in contest were located under school land warrants, and have been held and occupied by the plaintiffs, and, as they allege, are yet held and occupied by them by virtue of such location. Such a holding and occupation is not adverse to the title of the State ; on the contrary, it admits the title to be in the State, and the precise and only object of locating such warrants on public lands is, that the locator may

thereby acquire the title of the State. As between the
locator and the State, the location of the warrants is an ad-
mission by him that the title is in the United States, and
that he is authorized, as the holder of the warrant, to
select the particular tract on behalf of the State and
to appropriate it to his own use, and that he thereby
becomes entitled to a patent from the State. He holds,
therefore, not adversely, but in subordination to the
title of the State. His claim is, not that he has an adverse
title, but that he has an equitable right to demand that
the State shall convey to him its title. In other words,
he claims to be in the position of a purchaser in possession,
who is entitled to a conveyance; and in such cases it is
well settled that the possession of the purchaser is not
hostile, but is in consonance with the title of the vendor.
In order to put the Statute of Limitations in motion in such
a case, it must appear that the purchaser repudiated the title
of the vendor, and claimed to hold, not under that title,
but in hostility to it. The statute will commence to
run only from the time when the purchaser openly disa-
vows the title of the vendor and claims in hostility to it;
and, even in that case, notice of the repudiation of his title
must be brought home to the vendor, or the hostile claim of
the vendee must be evidenced by acts of such notoriety that
notice to the vendor will be presumed. These are familiar
propositions, and need no further discussion.

But it may be urged on behalf of the plaintiffs, that in re-
spect to these tide lands the State claims, and it has already
been assumed in this opinion, that inasmuch as the war-
rants could not be lawfully located on tide lands, the rela-
tion of vendor and vendee did not exist between the State
and the plaintiffs, or their predecessors. But this does not
obviate the difficulty. The State sold the warrants to the
predecessors of the plaintiffs on the express agreement that
they were to be located on public lands of the United States,
and on no other lands. Instead of this, however, the war-
rants were located, in violation of the agreement, on tide
lands not subject to such location. It is strictly analagous

to the case of a vendee who purchases from his vendor a particular tract of land, and who, through mistake or fraud, under color of his purchase, enters upon another tract of the same vendor. Notwithstanding the mistake or fraud, the entry is under the claim of title assumed to have been derived from the vendor, and is in subordination to the vendor's title. The vendee professes to hold and claim under the vendor, and not in hostility to his title. Such a possession cannot be deemed "adverse" in any just sense. The very essence of an adverse possession is, that the holder of it claims the right to his possession, not under, but in opposition to, the title to which his possession is alleged to be adverse. So long as he claims to hold under that title, his possession is not adverse to it, and the Statute of Limitations does not run against it. The plaintiffs, and their predecessors, claimed to be entitled to the possession of the lands in contest under and by virtue of the location of the school land warrants, and though it now appears that the lands were not in law subject to such location, nevertheless the possession was not adverse to the title of the State, for the reasons already stated, to wit: that it was claimed and held under the belief, as alleged in the complaint, that the locations were valid, and entitled the locators to the possession. The fact that they were mistaken in this belief cannot change the character of the possession and convert into a hostile occupation one which was in fact amicable. I am, therefore, of the opinion that, taking the whole complaint together, it does not aver or show in the plaintiffs or their predecessors a possession adverse to the title of the State. But if it be assumed that the complaint contains a full and sufficient averment of an actual adverse possession for more than ten years before the commencement of the action, I am, nevertheless, strongly inclined to the belief that the tide lands held by the State in virtue of its sovereignty are not within the purview of the third section of the Statute of Limitations. The title of the State is held by a peculiar tenure, and it may well be doubted whether it can be properly said to have "accrued" to the State, in the sense in

which that term is employed in this section. But it is unnecessary to express a decided opinion on this point, inasmuch as the views already announced dispose of the case.

In my opinion, the order refusing to dissolve the injunction ought to be reversed, and the District Court should be directed to enter an order dissolving the injunction, and it is so ordered.

By WALLACE, J: I concur in the judgment.

TEMPLE, J., having been of counsel, did not participate in the decision.